UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF LOUISIANA
SHREVEPORT DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA | CASE NO. 21-cr-00295 |
| VERSUS | JUDGE ELIZABETH E. FOOTE |
| JOSUE NAVA (01)<br>AILIN FERNANDA ROCHA NEVAREZ (02) | MAGISTRATE JUDGE HORNSBY |

## REPORT AND RECOMMENDATION

**Introduction**

Josue Nava ("Nava") and Ailin Fernanda Rocha Nevarez ("Nevarez") were driving on I-20 in Bossier Parish when they were pulled over by a Louisiana State Trooper for crossing the fog line. During the stop, a K-9 unit arrived and conducted an "open-air sniff" of the vehicle. The dog alerted to the presence of illegal drugs, and the troopers found cocaine, fentanyl, and tramadol during a search of the vehicle.

Before the court are motions to suppress filed by Nava and Nevarez (Docs. 36 & 37). Defendants allege that the traffic stop was unlawfully extended. For the reasons that follow, it is recommended that the motions to suppress be denied.

**Relevant Facts**

A suppression hearing was held on February 15, 2022. After the first hearing, Nevarez filed a motion to reopen the hearing. Doc. 45. Nevarez alleged that documents she received after the first hearing contradicted testimony in the hearing. Nava adopted Nevarez's motion. Doc. 47. The court granted the motion, and a second hearing was held.

Testimony at the two hearings, along with audio/video recordings of the traffic stop, established the following facts.

On September 25, 2021, Louisiana State Trooper George Strickland was traveling eastbound on I-20. He began following a group of vehicles that included a black Toyota 4Runner with Texas plates. Tr. 2, Doc. 63, p. 9. He was watching the vehicles to see if they were travelling together, and he began to run checks on the license plates of the vehicles. Tr. 2, p. 9. He noticed that the 4Runner was newly registered out of El Paso, Texas. Tr. 1, Doc. 44, p. 9. Based on his experience and training, Strickland knew that El Paso was a major drug source city. Tr. 1, p. 19. Strickland saw the 4Runner cross the fog line multiple times. He activated his emergency lights to initiate a traffic stop at 12:16 a.m. Tr. 1, p. 9. He also radioed other troopers and gave them a description and license plate number of the vehicle. Tr. 2, p. 14.

Strickland exited his vehicle and approached the driver's side of the 4Runner. Tr. 1, p. 12. Nevarez was driving, Nava was in the passenger seat, and a toddler was in a car seat in the rear passenger side of the car. Strickland began telling Nevarez to step out of the vehicle, but she rolled down the window and began speaking Spanish. Tr. 1, p. 13. Strickland went to the passenger's window and asked Nava whether he was able to speak English. Nava indicated that he could speak a little bit of English. Tr. 1, p. 15. Strickland explained who he was and the reason for stopping them, then Strickland asked the couple for their identification. Nevarez provided a Texas driver's license, and Nava provided a United States passport card. Tr. 1, pp. 15-16. Strickland suspected that Nava's passport card was not valid because it was damaged and had been heavily taped. Tr. 1, p. 16.

Strickland asked Nava about the couple's travel plans. Nava appeared to ask Nevarez in Spanish where they were going. Nava told Strickland that they were coming from El Paso and traveling to Atlanta, Georgia to go to Six Flags for the weekend. Strickland found it very odd that they would make a 20-hour drive each way to spend a weekend at Six Flags. Strickland also knew that there are two other Six Flags locations significantly closer to El Paso. Tr. 1, pp. 16-19. Strickland also found it suspicious that he could not see any luggage or diaper bags in the car. Tr. 19.

Strickland returned to his patrol car at 12:20 a.m. to run the driver's license and identification through his vehicle's mobile data terminal. Tr. 1, p. 22, 41. Strickland testified that it is difficult to get a license return when the license was issued in another state. He also indicated that, because Nava had only a passport card for identification, he had to search by name and date of birth. This resulted in numerous returns. Tr. 1, p. 26. All of the individuals identified in the returns had active warrants. Tr. 2, pp. 25-26.

Meanwhile, other troopers had been running a check on the license plate of the vehicle. The troopers were communicating with each other and Strickland using an instant messaging system. Tr. 1, p. 22. At 12:20 a.m., troopers began discussing the results of a license plate reader inquiry. They learned that the vehicle had made a similar trip in which it crossed the Texas-Louisiana line, crossed into Mississippi, then within two days returned to Texas. Tr. 1, pp. 23-24; Tr. 2, pp. 33-34. Trooper Justin Wardell told Strickland that the vehicle had made numerous trips crossing the border into Mexico and that the most recent trip was within the last 24 hours. Tr. 1, pp. 24-25.

Based on the totality of the circumstances, Strickland believed that Nevarez and Nava were engaged in criminal activity.[1] Tr. 1, p. 26. He messaged Trooper Colton Derrick, a K-9 handler, and asked him to come to the location to perform an open-air sniff. Tr. 1, p. 25. Trooper Derrick arrived at the scene at 12:31 a.m. Strickland went to the passenger side of the 4Runner and explained to Nava that, while he was still waiting for returns on the driver's license and passport ID, a K-9 handler was going to run a dog around their vehicle. Strickland noticed that Defendants' demeanors changed, and they appeared to be nervous. Tr. 1, p. 28.

At 12:33 a.m., Strickland decided to run Defendants' identification through dispatch. He initially used his mobile data terminal rather than using dispatch. Strickland explained that this is normal procedure to keep radio traffic down in case there is an emergency and dispatch is needed. Tr. 2, pp. 21-22. But Strickland had been unable to get an accurate return on Nava's identification, and dispatch is able to give a faster and more thorough result. Tr. 1, p. 30.

At 12:36 a.m., 20 minutes after the initial stop, the K-9 began to walk around the car and alerted to the presence of drugs. Tr. 1, p. 31. At 12:43 a.m., Strickland received a return from dispatch, who told him that Nava had an NCIC warrant out of New Mexico. Tr. 1, p. 30.

The troopers began searching the vehicle using a portable x-ray scanner to search for abnormalities. Tr. 1, pp. 32-33. They scanned the area behind the toddler's car seat

---

[1] Strickland is very experienced and has a keen eye for deception.

and found abnormalities there. Trooper Wardell peeled away the backing of the seat and saw packages in the seat cushion. The packages contained a mix of fentanyl, cocaine, and tramadol. Tr. 1, p. 34.

Defendants were then placed under arrest and Mirandized. Defendants indicated to the troopers that they did not understand because they were Mirandized in English. Tr. 1, p. 34. They were transported to Troop G, where Trooper Jordan McCormick interviewed them with Trooper Christian Lara acting as an interpreter. Tr. 1, p. 35, 90. Lara gave each Defendant their Miranda warnings, both verbally and in writing. Nava and Nevarez each indicated that they understood and signed a waiver of rights form. Tr. 1, pp. 91-92. They each also signed a form consenting to a search of their phones. Tr. 1, p. 94.

**Law and Analysis**

Defendants' original motions to suppress argued that the initial traffic stop was not justified and that any statements they made after their arrest were not voluntary. Docs. 36 & 37. After the second hearing, the court instructed counsel for Defendants to file a consolidated post-hearing memorandum in support of the motion to suppress that addresses all of the issues." Tr. 2, p. 66. Neither of Defendants' post hearing briefs addressed issues related to the initial stop or voluntariness of post-arrest statements. Accordingly, those issues are waived.

Defendants argue that the traffic stop was unlawfully extended and that all evidence discovered as a result of the unlawfully extended traffic stop should be suppressed. "The reasonableness of traffic stops and investigative detentions of motorists who are suspected of criminal activity is analyzed under the framework established in Terry v. Ohio, 392 U.S.

1 (1968)." United States v. Rosales-Giron, 592 Fed. Appx. 246, 250 (5th Cir. 2014); quoting United States v. Stevens, 487 F.3d 232, 244 (5th Cir. 2007). "Under Terry, we determine the reasonableness of an investigative stop by examining: (1) whether the officer's action of stopping the vehicle was justified at its inception, and (2) whether the officer's actions were reasonably related in scope to the circumstances that justified the stop." Id. Defendants no longer argue that the traffic stop was not justified at its inception (it was), so only the second Terry prong is at issue here.

An officer's actions are not reasonably related if the officer detains its occupants beyond the time needed to investigate the circumstances that caused the stop, unless the officer develops reasonable suspicion of additional criminal activity in the meantime. United States v. Brigham, 382 F.3d 500, 506 (5th Cir. 2004) (en banc). If the officer develops reasonable suspicion of additional criminal activity during the investigation of the circumstances that originally caused the stop, the officer may further detain the occupants for a reasonable time while appropriately attempting to dispel this reasonable suspicion. Id.; United States v. Aguilera, 2014 WL 7404535, at *3 (N.D. Tex.).

An officer may examine driver's licenses and vehicle registrations and run computer checks as part of the investigation of the circumstances that originally caused the traffic stop. United States v. Pack, 612 F.3d 341, 349-350 (5th Cir. 2010). The officer may also ask about the purpose and itinerary of the occupant's trip as part of this investigation because these questions are considered to be reasonably related in scope to the investigation of the circumstances that caused the stop. Id. An officer may ask questions on subjects unrelated to the circumstances that caused the stop, so long as the unrelated questions do

not extend the duration of the stop. Id. The reasoning behind this rule is that the Fourth Amendment protects against detention, not questioning. Id. Thus, no Fourth Amendment harm is done where the officer asks the occupant of a vehicle questions that are unrelated to his reason for stopping the vehicle while waiting for routine computer checks to be processed. Id.

Trooper Strickland stopped the vehicle for improper lane usage at 12:16 a.m. After discovering that Nevarez was unable to communicate in English, he asked Nava for identification. Strickland became suspicious when Nava produced a passport card that was heavily taped and did not appear valid. Strickland's suspicions were further raised when Nava told Strickland that they were making a 20-hour drive to go to Six Flags for the weekend. Strickland also did not see any luggage or items in the car consistent with this travel itinerary.

Strickland then returned to his patrol car to run a records check on the identification and the vehicle. While he was waiting for a return on those checks, he discovered through other troopers that the vehicle had made a similar trip in which it crossed the Texas-Louisiana line, crossed into Mississippi, then within two days returned to Texas. Another trooper notified Strickland that the vehicle had crossed the border into Mexico earlier the same day. At this point, Strickland still had not confirmed the validity of Nava's passport card because there were multiple identities associated with his search, and all of the individuals identified had active warrants.

Nava and Nevarez argue that Strickland delayed doing anything related to the initial reason for the stop and instead focused on a drug investigation. But by the time Trooper

Strickland returned to his car after first making contact with Defendants, troopers had developed reasonable suspicion of criminal activity. The vehicle was newly registered in El Paso, which is a known drug source city. The vehicle had crossed the U.S.-Mexico border numerous times and had done so the morning of the stop. The vehicle had also made a two-day round-trip drive from El Paso to Georgia earlier in the month. The couple's travel plans were nonsensical, and they did not appear to have luggage or bags for a trip with a toddler. Based on the totality of these circumstances, Strickland had ample reasonable suspicion sufficient to detain the defendants for further investigation. Furthermore, the dog niff, which provided probable cause to search the vehicle, was completed before Strickland received a reply from dispatch regarding the routine check of Nava's identification.

Accordingly,

It is recommended that Defendants' Motions to Suppress (Docs. 36 & 37) be denied.

## Objections

Under the provisions of 28 U.S.C. § 636(b)(1)(C) and Fed. R. Crim. P. 59(b)(2), parties aggrieved by this recommendation have **fourteen (14) days** from the date of this report and recommendation to file specific, written objections with the Clerk of Court, unless an extension of time is granted under Fed. R. Crim. P. 45(b). A party may respond to another party's objections within **fourteen (14) days** from the filing of the objections. Counsel are directed to furnish a paper copy of any objections or responses to the District Judge at the time of filing.

A party's failure to file timely written objections to the proposed findings, conclusions and recommendation set forth above shall bar that party, except upon grounds of plain error, from attacking on appeal the unobjected-to proposed factual findings and legal conclusions accepted by the district court. See Douglass v. U.S.A.A., 79 F.3d 1415 (5th Cir. 1996) (en banc).

THUS DONE AND SIGNED in Shreveport, Louisiana, this 12th day of October, 2022.

_____
Mark L. Hornsby
U.S. Magistrate Judge